### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

O'KEEFE & ASSOCIATES, INC.                    :

    Plaintiff                                :

VS.                                           :       CIVIL ACTION NO.
                                                      3:00CV00678 (SRU)

THEME CO-OP PROMOTIONS, INC.                  :

    Defendant                                :       NOVEMBER     , 2004

### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
### MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

Plaintiff, O'Keefe & Associates, Inc. ("O'Keefe") respectfully submits this

Memorandum of Law in support of its Motion to Dismiss and/or for Summary Judgment.

As set forth below, Counts One through Seven of Defendant's Amended Counterclaim

dated June 18, 2003 should be dismissed pursuant to Rule 12(b)(6), and/or Rule 56 of

the Fed.R.Civ.P., as the causes of action in question were not properly pleaded, were

not filed in a timely manner, fail to state a claim upon which relief may be granted and/or

lack sufficient evidentiary support to warrant a trial.

### STATEMENT OF FACTS

Plaintiff O'Keefe is a highly regarded national executive search firm specializing

primarily in the recruitment of qualified employment candidates in the fields of sales,

marketing and management. (Facts ¶1,2).  Defendant, Theme Co-Op Promotions

("TCP") is a California corporation specializing in marketing and promotions, primarily in

the food service industry.  (Facts ¶3).  Having heard of Plaintiff's expertise, Defendant

contacted Plaintiff concerning its search for qualified personnel.  Following a meeting in

Westport, Connecticut, the parties entered into four letter agreements signed by TCP on

July 29, 1998, October 9, 1998, November 13, 1998 and January 4, 1999, respectively.

(Facts ¶9-10, Ex. 1-5).  A fifth Agreement, dated December 23, 1998, was also received

and agreed to by Defendant, who paid the initial invoice called for in the Agreement.

(Facts ¶13).  Defendant also communicated to Plaintiff that they were always on the

lookout for talent and invited Plaintiff to bring attractive candidates to their attention.

(Facts ¶14).

The letter agreements signed by Theme all contained language that states "in the

event that an executive is hired in connection with work performed by O'Keefe &

Associates for a position different than the position described above, a full professional

fee based upon the first year's estimated cash compensation will be due for that

executive(s)." (Ex. 1-5).  According to the contracts, Plaintiff was entitled to 50% of its

fee upon signing of the contract and 50% upon completion of the search.  Id. The

contracts also provided that in the event an executive was hired in connection with work

performed by O'Keefe, a full professional fee based on the first year's compensation

would be due to Plaintiff. Id.  Defendant was also responsible for expenses.  Id.   In

addition, O'Keefe guaranteed to redo the search at no cost if a candidate was hired and

subsequently left TCP's employ within 90 days, or redo the search for 50% of the

original fee if a candidate left within 180 days.  Id.  With the exception of Todd Nonken,

all ten employees introduced to Theme by O'Keefe were employed by Theme for a

period in excess of six months.  (Facts ¶31).  Per the express contractual language, no "refund" of the professional fees earned by O'Keefe would be due at any time, regardless of the length of a successful candidate's tenure with TCP.  (Ex. 1-5).

The written Agreements entered into by the parties make absolutely no mention of any duty or responsibility on O'Keefe's part to test any candidates, let alone forward information regarding the testing to TCP.  (Ex. 1-5).  The written agreements entered into by the parties make no mention of any duty or obligation on O'Keefe's part to verify a candidate's educational or employment background, or check formal references.  (Ex. 1-5). TCP admittedly never inquired about the results of the testing done on potential candidates and never asked for copies of the tests, test results, or other documentation which it now claims O'Keefe should have provided, prior to filing discovery requests in the instant action.  (Ex. 24).

In relation to the searches performed for Theme, O'Keefe went through its basic four-step process which includes "1. Develop a position specification which describes the basic duties and responsibilities of the position; 2. Search the field to locate executives with qualifications closely matching the specifications; 3. Interview the most qualified candidates to obtain a comprehensive understanding of their accomplishments and potential; and 4. Present the most qualified candidates to the client for evaluation." (Facts ¶16).  Theme decided which of those candidates it wanted to interview and flew them out to California for daylong interview sessions with a number of Theme personnel. (Facts ¶18).

The various candidates' dates of hire and separation of employment are as follows:

| CANDIDATE | HIRE DATE | DATE LEFT TCP |
| --- | --- | --- |
| Steve Regan | 11/9/98 | 9/1/99 |
| John Sandwick | 11/9/98 | |
| Robert Cook | 11/24/98 | 6/15/99 |
| Crystal Hudson | 7/18/99 | 4/30/01 |
| Rick Banez | 5/24/99 | Dec 02/Jan 03 |
| Todd Nonken | 7/30/99 | 12/9/99 |
| Lori Rice | 8/2/99 | |
| Cary Rogers | 8/30/99 | 2002 |
| Siena Long | 1/24/00 | 4/25/01 |
| Kevin Mulrain | 1/3/00 | 4/25/01 |

(Facts ¶34).

STEVE REGAN

Steve Regan was hired as a National Accounts Manager in the East and began employment on November 9, 1998.  His starting annual compensation was $112,000. He resigned on September 1, 1999, approximately 10 months after he began.  (Ex. 18). Gersovitz stated that his performance was "fair" and that he left because he "didn't feel he was going to be able to earn what he wanted to earn and had some other opportunities."  (Gersovitz depo. at 162.)  Paul Sampson had discussions with Theme

4

Co-Op representatives regarding Rob Cooke and Steve Regan working on the East
Coast regarding their compensation plan and salary structure. Cooke and Regan
reported that they were hearing that there had been a long history of things not going
well on the East Coast for Theme Co-Op and almost all of their potential clients had
issues with Theme. Because of this, they were having a difficult time making sales. As
a result of this, Sampson was involved in discussions with Theme about potential
changes to the Cooke and Regan salary structure in order to keep them as employees
and allow them to be successful. However, before those changes could be finalized,
both Cooke and Regan resigned their positions. (Ex. 23 at 144., Ex. 24 at 168.)

JOHN SANDWICK

John Sandwick was hired on November 9, 1998 at a starting annual compensation of
$100,000. On September 1, 1999, he was promoted to Group Vice President and
received an increase in compensation to $125,000. On November 1, 2001, his income
was increased to $175,000. (Ex. 10). Because he was promoted to a Vice President
position within one year of his start date, O'Keefe was paid an additional fee of $30,000.
(Ex. 22-24). John Sandwick was a "slam dunk", an outstanding candidate who had a
strong interest in the position and the perfect background. (Sampson depo. at 114.) He
had an outstanding profile and was one of the best candidates Sampson has ever
interviewed for a job like this. (Sampson depo at 147.) As evidenced by his promotions
and increases in compensation, Sandwick was very successful in his employment with
Theme. (Gersovitz depo at 119, 126, 127; O'Keefe depo at 105-111.) Gersovitz

testified that John Sandwick began working Theme on November 9, 1998. He was promoted to Group Vice President on or about September 1, 1999. On January 1, 2001, his compensation was increased from $100,000 per year to $175,000 per year, indicating that he was performing well. (Gersovitz depo. at 119-120, 127.)

ROBERT COOKE

Robert Cooke was hired as a National Accounts Manager on November 24, 1998 working in the East at an initial compensation of $100,000. (Ex. 17). Cooke reported that he was "shocked that Coke was no longer part of the picture" and that he felt that the compensation plan presented by Theme was too risky. Cooke also suffered because Theme's reputation among potential clients on the East Coast had been hampered by previous relationships. Cooke also reported that "there must be something seriously wrong because Steve Regan, Janine Salveson and myself could not make a sale within the first six months." He also expressed surprise that there was no 401K plan in place. Janine Salveson was another National Accounts Manager hired directly by Theme without any involvement on the part of O'Keefe & Associates. Rob Cooke resigned his position on June 15, 1999, more than six months after he began. (Ex. 17). Chip Cohan expressed displeasure with Cook's results to date but not necessarily with his performance. (Sampson depo. at 167.)

CRYSTAL HUDSON

Crystal Hudson began employment on January 18, 1999 with an initial compensation of $82,000. (Ex. 14). On July 18, 1999, based on Sjoberg's recommendation that she

was doing a "great job", she received a $1,000 gift check for her positive performance. On January 18, 2000, at her annual review, her compensation was increased by 10% to $90,200. At her second annual review on January 18, 2001, her salary was increased by almost 10% to $99,000. Both her first and second annual reviews indicated positive performance. Crystal Hudson was laid off as a result of company wide cut backs, which included non-O'Keefe personnel, on or about April 30, 2001. (Ex. 14). Chuck Sjoberg indicated to John O'Keefe at the F&I Conference in May of 2001 that he was terribly unhappy that he had to let Crystal Hudson go because of business reasons. Crystal Hudson, herself, indicated to O'Keefe that she was blindsided by her termination as she was led to believe that she was doing very well and felt overall that she got a "raw deal". (O'Keefe depo. at 142.) Gersovitz testified that Crystal Hudson was laid off on April 30, 2001 as part of a company wide reduction in force. This reduction in force affected employees not hired through O'Keefe. Other employees who maintain their employment with Theme or at a certain salary level were asked to accept a 15% cut in compensation. (Gersovitz depo. at 111, 112.)

RICK BANEZ

Rick Banez began employment on May 24, 1999 as Field Communications Manager at a starting annual salary of $89,000. (Ex. 13). He received an increase to $93,400 on November 24, 1999. On May 26, 2000, he received an increase to $99,000. On January 29, 2001, he was promoted to Director of Field Communications and received an increase to $115,000 per year. (Ex. 13). Gersovitz concedes that he was a "good

performer". (Gersovitz depo at 129, 130). Rick Banez resigned in December of 2002 or January 2003 in order to take advantage of a "good opportunity at another company." (Gersovitz depo at 49.) Rick Banez was hired for Chuck Sjoberg's Field Communications group. "Chuck (Sjoberg) was looking for only all-stars so he saw quite a few candidates but he was holding out for the best." (Sampson depo at 222.) Gersovitz testified at his deposition that Rick Banez was a good employee for Theme and was promoted to Director of Field Communications on or about January 29, 2001. Theme is not aware of any reason that O'Keefe would not be entitled to its full fee with regard to the hiring of Rick Banez. (Gersovitz depo. at 40, 129-130.)

TODD NONKEN

Todd Nonken began employment on July 30, 1999 as Director of Marketing and Proposal Development at an initial compensation level of $175,000. (Ex. 19). In December of 1999, Nonken reported directly to Gerry Gersovitz who couldn't recall any immediate plans to terminate Nonken. (Gersovitz depo. at 166.) Nonken reported to O'Keefe that he was not happy right from the start with Theme's management style, lack of support and also thought that he had been misled as to the duties and responsibilities of the position and felt that given the level of autonomy that had been represented. Nonken also asked O'Keefe not to reveal this to Theme as he felt he would be terminated if he complained. (O'Keefe depo. at 147.)

LORI RICE

Lori Rice began employment on August 2, 1999 as Field Communications Manager in the mid-West.  (Ex. 12).  Gersovitz conceded that she was a "very good performer". (Gersovitz depo at 129.)  Gersovitz also concedes that Lori Rice has "done well" for Theme.  (Gersovitz at 67.)  Gersovitz testified that Lori Rice has done well in her position with Theme and she is a very good performer.  (Gersovitz depo. at 68, 129.)

CARY ROGERS

Cary Rogers was hired on August 30, 1999 as a National Account Director in the mid-West.  (Ex. 11).  On May 1, 2001, he was promoted to Group Vice President of Sales. His starting salary of $100,000 was increased to $150,000 on January 1, 2001 and $175,000 on May 1, 2001.  Cary Rogers' performance evaluation for Theme indicated that he was a "great addition".  Rogers ultimately resigned in 2002.

Cary Rogers began employment on August 30, 1999 as National Account Director in the mid-West at initial starting salary of $100,000.  His compensation was increased by 50% to $150,000 on January 1, 2001.  On May 1, 2001, he was promoted to Group Vice President of Sales and his compensation was increased $175,000.  Cary Rogers received positive performance evaluations at Theme and was called "a great addition". (Ex. 11).  Cary Rogers ultimately resigned sometime in 2002.  Gersovitz testified that Cary Rogers began employment with Theme on August 30, 1999.  His initial compensation was $100,000.  On January 1, 2001, he received an increase in compensation to $150,000 indicating that he was performing well.  On May 1, 2001, he

received a promotion to Group Vice President along with an increase in compensation to $175,000.  (Gersovitz depo. at 120-122.)

The resume received from Cary Rogers by O'Keefe was forwarded by Theme to another recruiter, Johnson & Co., in the Summer of 1999 as an example of an ideal candidate for the position.  On June 25, 1999, Walter "Chip" Cohan of Theme faxed a copy of Cary Rogers' resume to Stanley Johnson, senior partner at Johnson & Co. with a handwritten note stating "I will be interviewing this person in Chicago next week. Good profile example."  (Ex. 21).    Theme assured Johnson & Co. that they had severed all ties and relationships with any other executive search firms.  Theme's representations to Johnson & Co. were not true as it continued to maintain a relationship with O'Keefe & Associates.  (Ex. 21).

SIENA LONG

Siena Long was hired on January 24, 2000 as Director of Business Development at a starting salary of $250,000. (Ex. 15). On February 14, 2000, her responsibilities were increased to Director of Business Development and Marketing.  On April 19, 2000, she was promoted to Vice President, Business Development and Marketing and received a $5,000 bonus.  On December 4, 2000, she received an increase to $255,000 along with a $10,000 year-end bonus.  On April 25, 2001, at the same time that other employees were being laid off or being asked to accept reductions in compensation due to Theme's business difficulties, Siena Long resigned her position.  (Ex. 15, Ex. 24).

10

KEVIN MULRAIN

Kevin Mulrain was presented by O'Keefe to Theme as a candidate for a National
Account Director position in the East in approximately August of 1998.  (Ex. 16, 22-24).
TCP decided Mulrain was not as strong as some of the other candidates presented by
O'Keefe.  (Ex. 23 at 126.)  Mulrain ultimately began employment with Theme on
January 3, 2000 as a Director of National Account in the East.  Although Gersovitz
testified that Mulrain was a "not very good performer", his record would indicate
otherwise.  (Gersovitz depo. at 150.)  At his one-year anniversary, Mulrain's
compensation was increased by 36% to $150,000.  He also received positive
performance reviews while employed by Theme.  (Ex. 16)  Mulrain was also terminated
as a result of the reduction in force on April 30, 2001.

It is undisputed that TCP hired nine candidates as a result of O'Keefe's efforts.  A
tenth, Kevin Mulrain, was presented by O'Keefe and subsequently hired by TCP about a
year later. All ten individuals were hired by Theme and began employment between
November 9, 1998 and January 24, 2000.  The Agreements between the parties all
stated that final payments to O'Keefe would be made upon completion of the search.
O'Keefe was paid for the placement of only five of these ten individuals.  On or about
November 29, 1998, O'Keefe sent correspondence to Theme dealing with outstanding
invoices.  (Ex. 6).  On December 13, 1998, Theme responded with correspondence
directed to O'Keefe.  (Ex. 7).  On October 14, 1999, O'Keefe sent correspondence
responding Theme's December 13, 1998 correspondence.  (Ex. 8).

In one last attempt to resolve the situation, O'Keefe counsel sent correspondence to Gerry Gersovitz at Theme dated February 22, 2000. (Ex. 9). When no response was received, Plaintiff instituted the instant action or about April 12, 2000, seeking payment of its professional fees with regard to the placement of the remaining five candidates: Cary Rogers, Lorri Rice, Todd Nonken, Siena Long and Kevin Mulrain. Plaintiff filed an Amended Complaint and Jury Demand on or about December 15, 2000. On August 16, 2002, Defendant filed its Answer, Affirmative Defenses, Set-Off and Counterclaim. Defendant's original counterclaim was in three counts, alleging Breach of Contract, Unjust Enrichment and Promissory Estoppel. On or about June 18, 2003, Defendant filed a Motion for Leave to Amend its Counterclaim, which was granted by the Court over Plaintiff's objection. In addition to adding several additional paragraphs of factual allegations in support of its three original causes of action, Defendant added four additional counts alleging Fraudulent Misrepresentation, Negligent Misrepresentation, Negligence and violation of the Connecticut Unfair Trade Practices Act, <u>Conn</u>. <u>Gen</u>. <u>Stat</u>. §§42-110a, <u>et</u> <u>seq.</u>, ("CUTPA").

## ARGUMENT

Plaintiff moves to have Counts One (Breach of Contract), Two (Unjust Enrichment), Three (Promissory Estoppel), Four (Fraudulent Misrepresentation), Five (Negligent Misrepresentation), Six (Negligence) and Seven (CUTPA) dismissed pursuant Rule 12(b)(6) and/or Rule 56 of the Fed. R.Civ.P. The causes of action which

make up Defendant's counterclaim are fatally flawed in that they are not properly plead, were not filed in a timely manner, fail to state claims upon which relief may be granted and are utterly devoid of evidentiary support.  Plaintiff moves for summary judgment with regard to Count One of Defendant's Counterclaim as the evidence conclusively demonstrates that Plaintiff has met its contractual obligations and no genuine issues of material fact exist which would merit the time and expense of a trial on the issues presented in Defendant's Counterclaim.  Counts Two through Seven are similarly lacking in evidentiary support.  In addition, these counts are not properly pleaded, fail to state claims upon which relief may be granted, and are barred by the applicable statutes of limitations.  Plaintiff urges that Defendant's counterclaims are nothing but a transparent, after-the-fact attempt to deflect attention from it's own unethical and unlawful misconduct and, as such, should be dismissed in their entirety.

## 1.    FIRST COUNT (BREACH OF CONTRACT)

### A.    O'Keefe Clearly Met Its Obligations Under The Parties' Agreements

The First Count of Defendant's Counterclaim should be dismissed pursuant to Rule 56 of the Fed.R.Civ.P., as the evidence is overwhelmingly clear that Plaintiff performed its duties as set forth in the contracts between the parties. Plaintiff clearly met its obligations to

"1)  Develop a Position Specification which describes the basic duties and responsibilities of the position;

2)  Search the field to locate executives with qualifications closely matching the specifications;

3)  Interview the most qualified candidates to obtain a comprehensive understanding of their accomplishments and potential;

4)  Present the most qualified candidates to the client for evaluation."

(Defendant's First Amended Counterclaim, hereinafter "Counterclaim", ¶5).  As such, "the agreements provided for the payment of fees to O'Keefe" (Id., ¶6).  It is undisputed that O'Keefe not only presented the most qualified candidates to TCP for evaluation, but that TCP hired candidates presented by O'Keefe for all of the contracted positions, and others as well.  Moreover, Defendant did not simply rely on O'Keefe's representations, but carefully reviewed the candidates' resumes, backgrounds, and qualifications, and interviewed candidates at length.  Plaintiff presented qualified candidates with long track records of success and accomplishment.  Defendant's claim that these candidates were not qualified is undermined by the documentation received, including Defendant's own internal documents.  (Ex. 10-19).  The majority of those candidates were successful contributors to TCP, and some remain employed to this day.  Plaintiff's obligation to Defendant ceased when it presented candidates who were then hired by Defendant. Moreover, the evidence is clear that any problems those candidates encountered during their employment with TCP resulted from TCP's own internal difficulties and had nothing at all to do with the candidate's qualifications, let alone anything done or not done by Plaintiff.  Indeed, the record reveals that other employees not hired through O'Keefe's efforts, encountered many of the same difficulties while working for TCP.  (Ex. 20-21).

Defendant's counterclaims are largely based upon Plaintiff's alleged failure to conduct personality "tests" with regard to all potential candidates, verify their educational and employment backgrounds and/or check their formal references. Unfortunately for Defendant, nothing in the express written contracts entered into by the parties requires Plaintiff to do any of these things, a fact which is fatal to Defendant's claims. Defendant alleges in Paragraphs Seven through Nine of its Amended Counterclaim that:

> 7. At the time the parties entered into the agreements, O'Keefe made representations to TCP as to the services O'Keefe would perform in carrying out its obligations under the agreements.

> 8. O'Keefe represented to TCP that it would perform testing of prospective candidates which included the results of the testing.

> 9. Based on O'Keefe's representations to TCP, the parties further agreed and understood that O'Keefe would perform various additional tasks routinely performed by search firms including testing of prospective employees and conducting reference checks at appropriate times.

Unfortunately for Defendant, these claims, in addition to being entirely unsupported factually, are not mentioned anywhere in the contracts entered into between the parties. (Ex. 1-5). Defendant enumerates in Paragraphs 4 and 5 of its Counterclaim the duties O'Keefe was responsible to carry out in order to earn its compensation. Nowhere is there any mention of any obligation on O'Keefe's part to test candidates or conduct reference checks "at appropriate times". Defendant's transparent attempt to add terms to the parties' agreement after the fact, is entirely unavailing. The parties negotiated the language of the agreements, which were then reduced to writing and executed. Any

15

attempt to expand the express written agreements is entirely unavailing and barred by the parole evidence rule.

Moreover, the record is devoid of any factual support that the parties ever agreed that O'Keefe "would perform various additional tasks routinely performed by search firms, including testing of prospective employees and conducting reference checks at appropriate times" and provide TCP "a profile of the candidates which included the results of the testing." Defendant does not allege when, where or by whom these alleged representations were made and agreed to. It strains belief that Defendant's representatives, experienced and savvy businessmen with extensive experience dealing with recruiters, would negotiate and sign contacts that did not include material terms that the parties had agreed to.

B.    O'Keefe Fulfilled Any Obligation it May Have Had to TCP Regarding Testing

Gersovitz conceded at his deposition that he didn't know the name of the "test" that he now alleges that O'Keefe failed to perform, or even whether or not the candidates in question were in fact tested by O'Keefe (Gersovitz depo. at 38, 45). He further admits that even now he isn't sure whether any of the candidates presented by O'Keefe were unqualified. (Gersovitz depo. at 76.) Gersovitz also conceded that he only became aware that TCP's files were "incomplete" and, as such, that O'Keefe may have been deficient in carrying out its duties with regard to testing and reference checking, when it received Plaintiff's responses to Defendant's production requests in 2002. (Gersovitz depo. at 59-63.) Gersovitz testified that he could not recall why

16

O'Keefe was not paid for its services when originally invoiced in 1999 or early 2000. (Gersovitz depo. at 81.)  Whatever reasons for TCP's failure to pay the invoices as invoiced and called for under the parties' agreements, it obviously had nothing to do with TCP's incomplete files or any failure on O'Keefe's part to test candidates, check references or provide information to TCP, as TCP was admittedly not even aware of these alleged shortcomings until some three years later.  Indeed, the whole of Defendant's Amended Counterclaim is nothing more than a transparent attempt by TCP to cover its own tortious breach of the agreements between the parties by attempting to create issues and causes of action where none exist.  There is absolutely no evidence to support Defendant's claims that O'Keefe breached its contracts with Defendant, let alone that O'Keefe actively misrepresented facts to TCP, either negligently or fraudulently.  The Defendant is clearly grasping at straws, legally and factually, basing its counterclaim on information provided to Defendant through discovery in this case, years after the events in question, information which Defendant admittedly never requested previously.  In the process, Defendant has apparently abandoned the issues it raised in December of 1999 (Ex. 7), which is perhaps not surprising given their complete lack of merit.

While Defendant alleges that "O'Keefe failed to test prospective employees, including some of the employees ultimately hired by TCP" (Amended Counterclaim, ¶12), it fails to identify who these alleged candidates are.  Moreover, O'Keefe never represented that it would test each and every candidate as the Predicative Index is "not

17

always given, either … you don't need it a lot of times."  (O'Keefe depo. at 35.)

Moreover, O'Keefe can not force a candidate to complete the Predictive Index, and the

higher the level of the position, the more likely a candidate is to refuse to take the test.

(Ex. 23 at 57).  The record is clear that virtually all of the candidates presented by

O'Keefe were, in fact, asked to complete the Predictive Index.  (Ex. 22, 23).  The

Predictive Index consists of a series of personality traits and the candidate is asked to

fill in a bubble sheet indicating which traits they believe apply to them and which they

believe other people think apply to them.  (A copy of the Predictive Index completed by

Lori Rice is attached as Appendix C to Ex. 8).  The results are then tabulated to give

another input into assessing a candidate.  The results are not meant to be predictive,

but just another factor to consider in assessing a candidate, along with the candidate's

background, experience, interview and informal references, if available.  (Ex. 22, 23).

Defendant's allegations that O'Keefe intentionally concealed "negative testing

results" are entirely unsupported, in addition to being premised on a false assumption.

The Predictive Index is a subjective, non-predictive assessment designed to provide the

recruiters with additional information to be used, along with other information available,

in assessing potential candidates.  Unlike, for example, a typing test, the Predictive

Index is designed to provide clues as to a subject's personality traits.  The Index is non-

predictive, non-exact, subjective and open to interpretation.

John O'Keefe and Paul Sampson testified at length during their depositions as to

the nature of the Predictive Index and how it was utilized to assess candidates.  Where

the Predictive Index raised potential issues with regard to a potential candidate, O'Keefe would consider that information in light of all of the information available, including the candidate's background and experience, resume and personal interview.  O'Keefe would also discuss these potential issues internally, directly with the candidates, and with individuals who knew and worked with the candidate through informal reference checks.  (O'Keefe depo. at 36, 39-41, 46-49, 108-111, 113-121; Sampson depo. at 135-140.)  Following this process, O'Keefe would decide whether or not to recommend that the candidate be interviewed by TCP.  "If there's an issue, the candidate is not going there [to TCP]."  (O'Keefe depo. at 49.)  "If there's significant negative traits, they would not be in the final candidates set."  (Sampson depo. at 49.)  "In hardly any cases, if we have reservations is a candidate going in to interview."  (Sampson depo. at 50.)

The Predictive Index is "not testing.  It's an evaluation process.  It's one of our three - - we look at experience, we look at fit, and we look at personality."  (O'Keefe depo. at 29-30.)  O'Keefe's process is "all an evaluation, and it's a three-legged product. It's not more important than one of the other items.  It's all together.  So there's no true science."  (Id. at 30).  The Predictive Index "gives you another input in terms of making a decision as to who the most appropriate candidate is for the position, and it's an inexact science."  (Sampson depo. at 56.)  The Predictive Index "is directional, not predictive, and it's only an input into our decision as to who we recommend to the client."  Moreover, O'Keefe does not consider the Index to be an integral part of the search process (Sampson depo. at 58).

19

Moreover, there are no "negative" personality traits, but just traits. Obviously, each individual's personality is unique and cannot be precisely "tested" or measured. "The Predictive Index is not the bible." (O'Keefe depo. at 111.) The two personality traits that are very difficult to assess with the Predictive Index are energy level and strategic direction, "They are very subjective, so we have this issue a lot." (O'Keefe depo. at 108.) O'Keefe prepared a Personnel Appraisal for each of the candidates it presented to TCP. The Personal Appraisal "is a coordination of both the interview notes, the personality testing, the resume and anything else we know maybe even though informal referencing, about the candidate just to try to paint a picture before they get to an interview situation." (Sampson depo. at 124.) "Which candidates we recommended to a client is ultimately decided by the point person on the search based on all of the information available of which the Predictive Index is just one piece." (Sampson depo. at 55.) The Predictive Index is "directional, not predictive, and its only an input into our decision as to who we recommend to the client." (Sampson depo. at 191-192). "It's directional more than predictive, the test itself as it's designed. So we don't take it to be predictive,. This gives us a heads up that if there's an issue we need to check it out, informally check that, and if we still are positive about the candidate, the candidate goes in." (Sampson depo. at 137.)

In this case, the process worked exactly the way it was supposed to. O'Keefe followed up on the results of the Predictive Index by carefully reviewing the candidate's background and experience, interviewing the candidates directly, and informally

checking with other individuals who knew and worked with the candidates. (Ex. 22, 23).
After the entire process, O'Keefe represented to TCP those candidates it felt TCP should interview. The final decision as to whom to interview and ultimately, who to hire, remained at all times with TCP. (Sampson depo. at 133.) Indeed, prior to hiring any candidates, TCP brought the candidates out to California for one or more daylong interview sessions with its highest-level executives. Furthermore, contrary to its assertion that it relied on O'Keefe's recommendations, Gersovitz testified that TCP exercised its own independent judgment and periodically rejected O'Keefe's advice. (Ex. 24 at 64-65).

John Sandwick is a perfect example of the way the process worked. While the results of the Predictive Index indicated that Sandwick might be "not strategic" and "light on detail", Paul Sampson disagreed, based on all of the information available to him. (See Defendant's Amended Counterclaim at ¶¶21-24.) Sampson believed that Sandwick was, in fact, a strategic thinker and so indicated to TCP. Sampson "personally thought [Sandwick] was very strategic" and simply disagreed with the results of the Predictive Index, which "happens pretty frequently". (Sampson depo. at 155.) In fact, Sampson considered Sandwick a "slam dunk" (Sampson depo. at 114) and "one of the best candidates I've ever interviewed for a job like this." (Id. at 147-148.) In the end, Sampson was correct and Sandwick enjoyed a very successful tenure at TCP, as evidenced by his promotion to Vice President Sales Manager, within a year of hire and

the fact his salary at TCP increased from $100,000 on his date of hire (11/9/98) to $125,000 (10/1/99) to $175,000 (1/1/01). (Facts ¶38-40).

It is in O'Keefe's own self-interest to present only candidates who are well qualified and likely to be successful.  O'Keefe looks to establish long-term relationships with its clients in order to generate repeat business referrals and an enhanced reputation in the industry.  (Ex. 23 at 54-55).  Indeed, O'Keefe's reputation is what caused TCP to seek out O'Keefe in the first place.  There is no incentive, financial or otherwise, for O'Keefe to misrepresent the qualifications of a candidate.  Once the agreements were entered into O'Keefe was guaranteed payment under the agreements regardless of whether a candidate was hired through its efforts, from another source, or the search was cancelled for some other reason.  Moreover, the express terms of the agreements entered into between the parties merely require O'Keefe to seek out and present the "most qualified" candidates available (Counterclaim, ¶5).  Defendant's claim that O'Keefe failed to search for and present the most qualified candidates available simply makes no sense.  Of course, the record is clear that O'Keefe did in fact search out and present the most qualified candidates, who were extensively interviewed, reviewed and ultimately hired by TCP.  These candidates' history of positive evaluations, promotions and pay increases while at TCP, as well as their previous and subsequent successes and achievements, belie any claim that they were unqualified, let alone that O'Keefe knowingly and fraudulently misrepresented them as qualified.  As John O'Keefe testified, "We don't go by red lights.  If there's a red light, we're not going

to do it.  We're retained, we're paid.  So there's no reason to know candidates that are not going to do well.  So I can categorically say on my watch, we have never deceived a client at all through the testing."  (O'Keefe depo. at 48.)  Defendant has absolutely no evidence to refute this statement, let alone "clear and convincing" evidence sufficient to support a claim of fraud or fraudulent concealment.

C.     The Candidates Presented by O'Keefe Were Qualified.

As stated above, the record is clear that John Sandwick was not only fully qualified but was successfully employed by TCP for a substantial period of time. Similarly, there is no evidence Steve Regan or Robert Cooke were not fully qualified for the National Accounts Manager positions for which they were hired by TCP.  Regan and Cooke were hired to work the East Coast, where their efforts were hampered by previous relationship issues between TCP and potential clients on the East Coast. (Sampson depo. at 144-46).  Cooke accepted TCP's risky compensation plan "because in the hiring process it was portrayed to him that there was enough "low fruit on the tree" for him that he didn't need to worry about meeting his draw." (Ex. 17 at 0034).  Cooke also "expressed he was shocked on his first day in the office to find out that "Coke" was no longer in the picture at TCP.  He felt this made his job even more challenging."  Id. Indeed, Chip Cohan, TCP's Vice President responsible for Cooke and Regan, understood the problems and worked with Paul Sampson to create a more equitable salary and commission structure in an effort to keep Cooke and Regan.  In the end, this effort simply came too late.  (Ex. 23 at 144-46; Ex. 24 at 168).

Cooke "also stated that there must be something seriously wrong if Steve Regan, Jeannine Salveson and himself could not make a sale by the first six months they (sic) have been with TCP."  (Ex. 17 at 0034).  Jeannine Salveson was a National Account Manager hired directly by TCP, not through O'Keefe.  Like Cook, Salveson was surprised to learn upon starting work with TCP that Coke was no longer in the picture and "expressed that the main reason she was leaving was she felt the company was in transition, and she felt that with Coke's exit from the TCP picture the transition of the company was something she had not expected."  (Ex. 20 at 2566)  "She also mentioned that the fact that she was on a draw and the concern of being in a hole made her anxious.  She felt she was held back (because of the transition of the company)-and she was struggling to get where she needed to be in order to cover the draw." Id.  The fact that she experienced the same problems as Cooke and Regan undermines TCP's claims that Cooke and Regan were not qualified for their positions or that their difficulties were in any way the result of any thing O'Keefe did or failed to do. Furthermore, the candidates placed with TCP by another recruiter, Johnson and Company, reported similar problems with their salary and commission structures and the fact that they felt TCP had misrepresented their duties, responsibilities, and earning potential to them.  (Ex. 21).

2.     **SECOND COUNT (UNJUST ENRICHMENT)**

The doctrine of unjust enrichment is essentially based upon an equitable theory of recovery. Franks v. Lockwood, 146 Conn. 273, 278 (1959). Accordingly, this legal doctrine is applied only when "no remedy is available by an action on the contract." Hartford Whalers Hockey Club v. The Uniroyal Goodrich Tire Co., 231 Conn. 276, 282 (1994) (citing 5 C. Williston, Contracts (Rev. Ed. § 1479). Courts have uniformly held that a claim for unjust enrichment is not available where there is an enforceable express contract between the parties. See, e.g., Miller v. O.S. Shipping & Trading Corp., 2001 WL 1468917 *2 (2001) (striking claim for unjust enrichment because the claim alleged existence of express contract); Samuel McClendon Buildings v. Bizier, 2000 WL 1819392 * 2 (2000) (unjust enrichment count is moot since the court found the existence of an express contract); Unifirst Corp. v. Mark Ford Mercury, Inc., 1997 WL 375126 **3 (1997) (same); Desaro, Jensen & Reichert P.C. v. Bozzuto's Carting Co., Inc., 1995 WL 462389 (1995) ("the doctrine of unjust enrichment is not available where a remedy exists in an action on the contract"). Here, in contravention of well-established law, defendant not only acknowledges the existence of express contracts between the parties, but improperly asserts a claim for unjust enrichment based upon these contracts. Defendant's Second Count expressly incorporates paragraphs 1-35 of its first count alleging breach of contract. Indeed, the only "unjust enrichment" Defendant alleges that Plaintiff received is the payments called for under the parties'

agreements.  As such, this cause of action is entirely superfluous and should be dismissed.

Moreover, as described above, the record is devoid of any evidence to support a claim of unjust enrichment.  O'Keefe received partial payments for the efforts it performed pursuant to the agreements between the parties.  Plaintiff was entitled to full payment for those services upon performance, regardless of whether or not qualified candidates were presented and hired by TCP, as they were with regard to all of the positions.

In addition, any claim that payments made to O'Keefe prior to August 15, 1999, three years prior to the filing of Defendant's original counterclaim, constitute unjust enrichment would clearly be time-barred.  Defendant's claims of unjust enrichment would further be barred by the equitable doctrines of laches and Defendant's own unclean hands.  Defendant's belated and misguided attempt to dress up a simple breach of contract claim with additional causes of action is unavailing, as those claims are legally insufficient, not pleaded in a timely manner and/or unsupported by credible evidence sufficient to raise a genuine issue of material fact warranting consideration by the trier of fact.  Accordingly, the Second Count of Defendant's Counterclaim should be dismissed in its entirety.

**3.      THIRD COUNT (PROMISSORY ESTOPPEL)**

Count Three of Defendant's Amended Counterclaim, like Count Two, expressly incorporates paragraphs 1-35 of Count One alleging breach of contract.  Promissory

Estoppel is a "consideration substitute" applicable only in the absence of an enforceable contract. Pavliscak v. Bridgeport Hospital, 48 Conn. App. 580, 711 A.2d 747 (1998). Defendant concedes that the parties entered into a series of agreements, which are valid and enforceable contracts, thereby precluding Defendant's promissory estoppel claims. Moreover, Defendant has no evidence that O'Keefe misrepresented anything to TCP, or that O'Keefe failed to honor any of its commitments. Moreover, there is no evidence to support Defendant's claims that it was damaged in any way as a result of any detrimental reliance on O'Keefe's claims. O'Keefe presented qualified candidates to TCP and it was TCP who made the decision as to which candidates to hire.

Defendant has also failed to show that it exercised due diligence in obtaining the true facts. "It is fundamental that a person who claims an estoppel must show that he has exercised due diligence to know the truth, and that he not only did not know the true state of things but also lacked any reasonably available means of acquiring knowledge …" Connecticut National Bank v. Voog, 223 Conn. 352, 366, 659 A.2d 172 (1999). Here, TCP admittedly never asked for the information it now states it should have received, and even now, cannot say for sure whether or not the candidates presented by O'Keefe were tested or qualified. (Ex. 24 at 59-63, 76, 81). As with Count two, Defendant's belated and misguided attempt to dress up a simple breach of contract claim with additional causes of action is unavailing, as those claims are legally insufficient, not pleaded in a timely manner and/or unsupported by credible evidence

sufficient to raise a genuine issue of material fact warranting consideration by the trier of fact.  As such, Count Three should be dismissed in its entirety.

4.    **FOURTH COUNT (FRAUDULENT MISREPRESENTATION)**

Claims for fraud are governed by the three year statute of limitations of C.G.S. §52-577, Day v. General Electric Credit Corp., 15 Conn. App. 677 (1988).  As paragraph 3 of Defendant's Counterclaim makes clear, the last of the four Agreements was entered into on January 4, 1999, more than three years prior to the filing of Defendant's original Counterclaim, let alone the Amended Counterclaim.  The last of the candidates presented by O'Keefe began working for TCP on January 24, 2000, more than three years prior to the time Defendant first asserted a claim of fraudulent misrepresentation in its Amended Counterclaim dated June 18, 2003. Indeed, Defendant's original counterclaim was filed August 16, 2002, more than three years after all of the candidates were hired by TCP with the exception of Cary Rogers, Kevin Mulrain and Siena Long.  Of course, Defendant claims no damages resulting from its hiring of Kevin Mulrain, as it claims that he was not hired as a result of O'Keefe's efforts, but as a result of the efforts of another recruiter, Johnson and Company.  In addition, at least three candidates, Steve Regan, Robert Cooke and Todd Nonken, were actually **terminated** by TCP more than three years prior to the filing of Defendant's original Counterclaim on August 16, 2002, let alone the Amended Counterclaim dated June 18, 2003.  Certainly, Defendant must have become aware of any lack of skills, knowledge or other qualifications exhibited by Messrs. Regan, Cooke and Nonken prior to their

termination from employment.  Therefore, any claims related to these individuals must be dismissed as a matter of law as the claims alleged in Count Four are clearly barred by the applicable statute of limitations.

Defendant has also failed to meet the heightened standard of pleading with regard to claims of fraud under the Fed.R.Civ.Proc. 9(b), which requires that such claims be pleaded with specificity, "fraud allegations must identify the alleged fraudulent statement, the speaker, the place where the statements were made, and an explanation of why the statements were false."  See, e.g., Perkett v. Applied Printing Tech., L.P., 2004 U.S. Dist. Lexis 2399 (D.Conn. 2004)(GLG); citing Shields v. City Trust Bankcorp, Inc., 25 F.3d 1124, 1127-28 (2nd Cir. 1994); Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2nd Cir. 1995).  The elements comprising an action for fraudulent misrepresentation are: "(1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to act upon its; and (4) the other party did so act upon that false representation to its injury."  Barbara Weisman, Trustee v. Kaspar, 233 Conn. 531, 539 (1995).  Further, there must be reasonable reliance on the misrepresentation for a plaintiff to recover damages.  Citino v. Redevelopment Agency of the City of Hartford.  51 Conn. App. 262, 275 (1998).  Defendant has failed to plead any of the above elements with the requisite specificity, nor is there a sufficient factual basis to support any of the above elements, especially under the "clear and convincing evidence" standard applicable to fraud claims.

Paragraph 36 of Defendant's Fourth Count alleges, "In an effort to induce TCP to enter into the four agreements, O'Keefe misrepresented to TCP that it would test all prospective employees and would provide to TCP a profile of the candidates which included the results of the testing." Defendant fails to allege who made these statements, where, when and to whom. Defendant also fails to allege, let alone support with evidence, that any such misrepresentations were made as statements of fact, were untrue and known to be untrue by the party making the statements, or were made to induce the other party to act upon them. Similarly, while Defendant claims that "O'Keefe failed to test prospective employees, including some of the employees hired by TCP" (Counterclaim at ¶12), it fails to identify the employees in question. Indeed, Gerry Gersovitz concedes that he doesn't even know which, if any, of the candidates were not tested by O'Keefe. (Ex. 24 at 38, 45, 76). Similarly, while Defendant alleges that "O'Keefe also neglected to conduct reference checks on many of the employees for whom it was paid commissions, and failed to verify background data for these employees" (Counterclaim at ¶4), it fails to identify which employees, let alone who at O'Keefe allegedly promised to perform such duties, where, when and to whom. No such agreement was ever committed to writing.

Defendant's assertions of fraudulent misrepresentation are contradicted by its own allegations in paragraph four of Defendant's Counterclaim, which correctly sets forth O'Keefe's obligations under the contracts entered into between the parties. Notably absent is any language that "O'Keefe would test all prospective employees and

would provide to TCP a profile of the candidates which included results of the testing."

Defendant is a successful and savvy corporate entity, and the contracts at issue were

reviewed and signed by its top executives.  Any reliance on the alleged oral statements

would not have been reasonable given that the parties' Agreements were reduced to

writing. (Facts ¶9-10).

Moreover, Plaintiff's representatives, John O'Keefe and Paul Sampson, testified

credibly and without contradiction that while testing was generally done, it was but one

part of the equation.  There is no evidence that O'Keefe misrepresented any "facts" to

TCP, let alone that it did so intentionally or with fraudulent intent.  Indeed, the term "test"

itself is a misnomer, as the process is a subjective one to gauge an individual's

personality traits, is open to interpretation and is by no means foolproof.  There is

absolutely no evidence that O'Keefe made any false statements of fact, knowingly or

otherwise.  Nor is there any evidence that TCP relied on any such representations or

that it suffered any injury as a result.  Prior to hiring the candidates in question,

Defendant had the opportunity to review their resumes and qualifications, and each

candidate was personally interviewed by several members of TCP management.  The

record is clear that TCP was presented with and hired qualified candidates, the majority

of whom were extremely successful at TCP.

Fraud must be proven by "clear and convincing evidence".  <u>Black v. Goodwin,</u>

<u>Loomis & Britton, Inc.</u>, 239 Conn. 144, 163 (1996).  Thus, the evidence must be such

that it "induces in the mind of the trier, a reasonable belief that the facts asserted are

highly probably true, that the probability that they are true or exist is substantially greater than the probability that they are false or do not exist." <u>Dacey v. Connecticut Bar Association</u>, 170 Conn. 520, 537 (1976). This "clear and convincing evidence" standard has been described as "a quantum of proof lying at an intermediate point between the 'preponderance of the evidence' standard appropriate to most civil cases and the 'beyond a reasonable doubt' standard employed in criminal prosecutions". <u>International Controls and Measurements Corp. v. Watsco, Inc.</u>, 853 F.Supp. 585, 587 (S.D.N.Y. 1994). Appellate courts in Connecticut have repeatedly warned that fraud is not to be presumed, but must be proven by the clear and convincing evidence standard. Defendant has no evidence of any "fraudulent concealment", let alone evidence that is "clear and convincing."

Defendant argues that the applicable statutes of limitations should be tolled because of the fact that Plaintiff did not promptly respond to its extensive interrogatories and production requests. It seeks to have the Court do what is expressly prohibited, and "presume" that the reason was fraudulent concealment. TCP concedes that it never requested the documentation concerning testing or anything else prior to serving discovery requests in this action, and never made any specific requests or inquiries regarding the testing or its results. (Ex. 24 at 59-63.) Finally, TCP was presented with and hired qualified candidates with long histories of success and achievement before, during and after their employment with TCP. As such TCP has suffered absolutely no injury.

Defendant's arguments are further belied by its own dilatory tactics in responding to Plaintiff's discovery requests. Plaintiff's initial discovery requests were served on December 11, 2001, and Defendant's initial responses were not received until August 16, 2002. Plaintiff's Second and Third Set of Discovery Requests were served on March 10, 2003 and March 17, 2003 respectively, and no response was received until over a year later on April 22, 2004, and only after Plaintiff filed a Motion to Compel. Is this because of Defendant's desire to "fraudulently conceal" this evidence or some other improper motive, or is the more likely reason the fact that Defendant's representatives, like Plaintiff's, are busy trying to run their businesses while still meeting their discovery obligations. As Attorney Ball noted, responding to Defendant's discovery requests was "A long task I'm sure. My client did the same". (Sampson depo. at 74.) Moreover, there is absolutely no evidence that Plaintiff or its owners, officers, employees, agents or representatives placed any particular importance to the documents they are accused of fraudulently concealing. Indeed, the documents in question are innocuous, hardly the "smoking gun" that would support a claim of fraudulent concealment. Defendant's attempts to spin straw into gold aside, there is insufficient evidence of fraud to warrant consideration by the trier of fact even under the less exacting "preponderance of the evidence" standard.

5.    **COUNT FIVE (NEGLIGENT MISREPRESENTATION)
AND COUNT SIX (NEGLIGENCE).**

TCP's claims for Negligent Misrepresentation (Count Five) and Negligence

(Count Six) are barred by the applicable statute of limitations.  C.G.S. §52-584 provides,

in pertinent part, that "no action to recover damages for injury to the person … caused

by negligence … shall be brought but within two years from the date when the injury is

first sustained or discovered … and except that no such action may be brought more

than three years from the date of the act or omission complained of".  See e.g., Cucuel

v. Fayed, No. CV-94-315420, 1997 WL 120007, *3 (Conn. Super. CT, Feb. 28, 1997).

The candidates presented by O'Keefe were hired by TCP between November 9, 1998

and January 24, 2000.  Any "act or omission complained of" on O'Keefe's part must,

therefore, have taken place prior to January 24, 2000, more than three years **prior** to

Defendant's Amended Counterclaim dated June 18, 2003.  Indeed, Defendant's original

counterclaim was filed August 16, 2002, more than three years after all of the

candidates were hired by TCP with the exception of Cary Rogers, Kevin Mulrain and

Siena Long.  Of course, Defendant claims no damages resulting from its hiring of Kevin

Mulrain, as it claims that he was not hired as a result of O'Keefe's efforts, but as a result

of the efforts of another recruiter, Johnson and Company.

In addition, at least three candidates, Steve Regan, Robert Cooke and Todd

Nonken, were actually **terminated** by TCP more than three years prior to the filing of

Defendant's original Counterclaim on August 16, 2002, let alone the Amended

Counterclaim dated June 18, 2003.  Certainly, Defendant must have become aware of any lack of skills, knowledge or other qualifications exhibited by Messrs. Regan, Cooke and Nonken prior to their termination from employment.  Therefore, any claims related to these three individuals must be dismissed as a matter of law.  Similarly, Crystal Hudson and Siena Long both terminated their employment with TCP more than two years prior to the filing of the Amended Counterclaim, further supporting the propriety of summary adjudication with regard to Defendant's claims arising out of the hiring of these individuals.

Counts Five (Negligent Misrepresentation) and Six (Negligence) are insufficient as a matter of law and fail to state claims upon which relief can be granted.  Defendant has pled that Plaintiff breached the express written contracts that existed between the parties in Count One.  While Counts Five and Six allege that a duty existed between the parties, it does not specify from whence that duty arose.  Such a duty could only have resulted from the contractual agreements between the parties, as alleged in Count One of Defendant's Counterclaim.  It is axiomatic that a party may not seek recovery for alleged negligence or negligent misrepresentation when the duty which gives rise to the claims derives from an enforceable, express written contract between the parties.  Defendant may attempt to convince the jury it suffered damages as a result of Plaintiff's breach of contract but should not be allowed to muddy the waters by pursuing claims that are clearly derivative of and encompassed in its claimed breach of contract.

35

6.     **COUNT SEVEN (CONNECTICUT UNFAIR TRADE PRACTICES ACT)**

Defendant's Claimed Violation of the Connecticut Unfair Trade Practices Act ("CUTPA") is barred by the applicable statute of limitations set forth in C.G.S. §42-110g(f).  Claimed violations of CUTPA are subject to a three-year statute of limitations. C.G.S. §42- 110g(f).  No CUTPA claim was raised prior to Defendant's Amended Counterclaim dated June 18, 2003, which, as described above, was more than three years after the last individual presented by O'Keefe was hired by TCP.  Moreover, as further described above, several of the individuals in question actually terminated their employment with TCP more than three years prior to the first claimed violation of CUTPA by TCP. As such, Defendant's claimed violation of CUTPA is time-barred and Count Seven should therefore be dismissed in its entirety.

Defendant's claims in Count Seven also fail to state claims upon which relief may be granted, and/or are not factually supported.  The Connecticut Unfair Trade Practices Act is designed to protect consumers from unscrupulous business practices.  It was not designed to and does not provide protection to a corporate entity such as Defendant whose President, Gerry Gersovitz, is an experienced and savvy businessman. Moreover, there is absolutely no evidence of any "oppressive, unscrupulous or fraudulent" behavior on the part of Plaintiff to support a claim under CUTPA.  Indeed, as set forth above, Defendant cannot even make out a claim for breach of contract.  It is well established that a simple breach of contract is not sufficient to establish a CUTPA violation.  <u>Paulus v. Lasala</u>, 56 Conn. App. 139, 152, 742 A.2d 379 (1999).  Moreover,

36

Plaintiff's conduct was in no way "unlawful, did not offend public policy as established by statutes, common law or some established concept of what is fair, was not immoral, unethical, oppressive or unscrupulous, and did not cause substantial injury to consumers or competitors".  Id.   Moreover, while Defendant alleges that it "has suffered ascertainable loss of money or property" (Counterclaim, Paragraph 38), nowhere in its Counterclaim does Defendant specify the nature or amount of its loss, let alone provide evidence to support such a claim.

Plaintiff has repeatedly made good faith efforts to address the issues that existed between the parties.  (Ex. 6, 8, 22, 23.)  Defendant, in turn, avoided returning calls, put forth unsupported and changing claims and objections, and obviously filed its counterclaims as a litigation tactic.  Indeed, there is ample evidence that TCP has a pattern and practice of unfairly attempting to avoid its contractual obligations.  (Ex. 21, 22.)  As such, there is no basis for a CUTPA claim to proceed.  (Ex. 7, Ex. 22 at 125, Ex. 23 at 275, Ex. 24 at 59-63, 76, 81.)

## CONCLUSION

WHEREFORE, for the foregoing reasons, Plaintiff respectfully moves that

Defendant's Amended Counterclaim be dismissed in its entirety.

THE PLAINTIFF


BY_____
                    Francis D. Burke
                    MANGINES & BURKE, LLC
                    1115 Main Street, Suite 708
                    Bridgeport, CT  06604
                    (203) 336-0887
                    Fed. Bar No. ct18688

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, via U.S. Mail,

postage prepaid, this _____ day of November 2004, to:

David A. Ball, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT  06604


_____
Francis D. Burke

38