UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| O'KEEFE & ASSOCIATES, INC. | : | |
| Plaintiff | : | |
| VS. | : | CIVIL ACTION NO. 3:00CV00678 (SRU) |
| THEME CO-OP PROMOTIONS, INC. | : | |
| Defendant | : | NOVEMBER    , 2004 |

**PLAINTIFF'S RULE 56(a) STATEMENT OF FACTS
IN SUPPORT OF SUMMARY JUDGMENT**

1. Plaintiff, O'Keefe & Associates, Inc. ("O'Keefe"), is an employment search firm headquartered in Southport, Connecticut. (Ex. 22 at 9, Ex. 23 at 7.)

2. O'Keefe performs employment searches for executives primarily in the sales and marketing field for companies throughout the United States. (Ex. 23 at 16-17.)

3. Theme Co-Op Promotions, Inc. ("Theme") is an advertising and marketing firm with a principal place of business in San Francisco, California. (Ex. 24.)

4. John O'Keefe is the sole owner and a principal of the firm of O'Keefe & Associates. (Ex. 23 at 43.)

5. Paul Sampson is also a principal with O'Keefe. (Id.)

6. Gerry Gersovitz is the President and Chief Executive Officer of Theme. (Ex. 24.)

7. Walter "Chip" Cohan was the Vice President and Sales Manager for Theme. (Ex. 24.)

8. Chuck Sjoberg was a Vice President of Field Communications of Theme. (Ex. 24.)

9. In the Spring of 1998, Cohan and Gersovitz approached O'Keefe about the possibility of performing executive searches for marketing and sales professionals for Theme. (Ex. 23 at 79.)

10. The parties held a meeting in Westport, Connecticut. (Ex. 23 at 80.)

11. The parties subsequently entered into a number of contracts for services including fully executed letter agreements dated July 29, 1998, October 9, 1998, November 13, 1998 and January 14, 1999. (Ex. 1-4.)

12. The terms of these agreements were accepted by Theme and fully executed by them. (Id.)

13. Another agreement, dated December 23, 1998, was also received and accepted by TCP, who paid the initial invoice. (Ex. 5.)

14. Theme also indicated to O'Keefe that they were always on the look out for qualified individuals and if O'Keefe came across individuals who might be of interest to Theme, even though not specifically related to an active job search, that O'Keefe should bring these individuals to Theme's attention. (Ex. 6, 8, 22, 23.)

15. The letter agreements signed by Theme all contained language that states "in the event that an executive is hired in connection with work performed by O'Keefe &

Associates for a position different than the position described above, a full professional fee based upon the first year's estimated cash compensation will be due for that executive(s)." (Ex. 1-5)

16. In relation to the searches performed for Theme, O'Keefe went through its basic four-step process which includes "1. Develop a position specification which describes the basic duties and responsibilities of the position; 2. Search the field to locate executives with qualifications closely matching the specifications; 3. Interview the most qualified candidates to obtain a comprehensive understanding of their accomplishments and potential; and 4. Present the most qualified candidates to the client for evaluation." (Ex. 1-5, 22, 23.)

17. As a result of its efforts, O'Keefe presented a number of candidates to Theme for consideration. (Ex. 6, 19, 22-24.)

18. Theme decided which of those candidates it wanted to interview and flew them out to California for daylong interview sessions with a number of Theme personnel. (Id.)

19. Ultimately, Theme hired nine (9) individuals as a result of O'Keefe's efforts:

       1.    Rob Cook;

       2.    Steve Regan;

       3.    John Sandwick;

       4.    Carey Rogers;

      5.    Lorri Rice;

      6.    Rick Banez;

      7.    Crystal Hudson;

      8.    Todd Nonken; and

      9.    Siena Long.  (Id.)

20.    A tenth candidate, Kevin Mulrain, was presented by O'Keefe to Theme for a National Accounts Manager position in 1998.  (Ex. 6-8, 16, 21-24.)

21.    Ultimately, Mulrain decided he was not interested in working for Theme and another candidate was selected at the time.  (Ex. 22-24.)

22.    O'Keefe, however, learned that approximately one year later Mulrain was hired by Theme for an Account Manager position.  (Ex. 22-23.)

23.    All ten individuals were hired by Theme and began employment between November 9, 1998 and January 24, 2000.  (Ex. 6-24.)

24.    The Agreements between the parties all stated that final payments to O'Keefe would be made upon completion of the search.  (Ex. 1-5.)

25.    All the above searches were, in fact, completed and candidates presented by O'Keefe were hired by Theme for all the positions.  Despite that fact, Theme did not make timely payment on the balance owed.  (Ex. 6, 8, 22-24.)

26.    On or about November 29, 1998, O'Keefe sent correspondence to Theme dealing with outstanding invoices.  (Ex. 6.)

27. On December 13, 1998, Theme responded with correspondence directed to O'Keefe. (Ex. 7.)

28. On October 14, 1999, O'Keefe sent correspondence responding Theme's December 13, 1998 correspondence. (Ex. 8.)

29. In one last attempt to resolve the situation, O'Keefe's counsel sent correspondence to Gerry Gersovitz at Theme dated February 22, 2000. (Ex. 9.)

30. When no response was received, Plaintiff instituted the instant action.

31. With the exception of Todd Nonken, all ten employees introduced to Theme by O'Keefe were employed by Theme for a period in excess of six months. (Ex. 6-8, 10-19, 22-24.)

32. The Agreements between the parties provided for O'Keefe to redo the search at a reduced fee in the event a candidate was employed less than six months. (Ex. 1-5.)

33. There was no provision in any of the Agreements for any refund or other services due from O'Keefe for an employee employed greater than six months. (Ex. 1-5.)

34. The various candidates' dates of hire and separation of employment are as follows:

| CANDIDATE | HIRE DATE | DATE LEFT TCP |
| --- | --- | --- |
| Steve Regan | 11/9/98 | 9/1/99 |
| John Sandwick | 11/9/98 | |

| | | |
|---|---|---|
| Robert Cook | 11/24/98 | 6/15/99 |
| Crystal Hudson | 7/18/99 | 4/30/01 |
| Rick Banez | 5/24/99 | 12/02 / 1/03 |
| Todd Nonken | 7/30/99 | 12/9/99 |
| Lori Rice | 8/2/99 | |
| Cary Rogers | 8/30/99 | 2002 |
| Siena Long | 1/24/00 | 4/25/01 |
| Kevin Mulrain | 1/3/00 | 4/25/01 |

(Ex. 6-8, 10-19, 22-24.)

    35.    Steve Regan was hired as a National Accounts Manager in the East and began employment on November 9, 1998. His starting annual compensation was $112,000. (Ex. 18.)

    36.    Regan resigned on September 1, 1999, approximately 10 months after he began. Gersovitz stated that his performance was "fair" and that he left because he "didn't feel he was going to be able to earn what he wanted to earn and had some other opportunities." (Ex. 18, Ex. 24 at 162.)

    37.    Paul Sampson had discussions with Theme Co-Op representatives regarding Rob Cook and Steve Regan working on the East Coast regarding their compensation plan and salary structure. Cook and Regan reported that they were hearing that there had been a long history of things not going well on the East Coast for Theme Co-Op and almost all of their potential clients had issues with Theme. Because

of this, they were having a difficult time making sales. As a result of this, Sampson was involved in discussions with Theme about potential changes to the Cook and Regan salary structure in order to keep them as employees and allow them to be successful. However, before those changes could be finalized, both Cook and Regan resigned their positions. (Ex. 23 at 144.)

     38.    John Sandwick was hired on November 9, 1998 at a starting annual compensation of $100,000. On September 1, 1999, he was promoted to Group Vice President and received an increase in compensation to $125,000. On November 1, 2001, his income was increased to $175,000. (Ex. 10.)

     39.    Because Sandwick was promoted to a Vice President position within one year of his start date, O'Keefe was paid an additional fee of $30,000. John Sandwick was a "slam dunk", an outstanding candidate who had a strong interest in the position and the perfect background. (Ex. 23 at 114.) He had an outstanding profile and was one of the best candidates Sampson has ever interviewed for a job like this. (Ex. 23 at 147.) As evidenced by his promotions and increases in compensation, Sandwick was very successful in his employment with Theme. (Ex. 24 at 119, 126, 127; Ex. 22 at 105-111.)

     40.    Gersovitz testified that John Sandwick began working Theme on November 9, 1998. He was promoted to Group Vice President on or about September 1, 1999. On January 1, 2001, his compensation was increased from $100,000 per year to $175,000 per year, indicating that he was performing well. (Ex. 24 at 119-120, 127.)

41. Robert Cook was hired as a National Accounts Manager on November 24, 1998 working in the East at an initial compensation of $100,000. (Ex. 17.)

42. Cook reported that he was "shocked that Coke was no longer part of the picture" and that he felt that the compensation plan presented by Theme was too risky. Cook also suffered because Theme's reputation among potential clients on the East Coast had been hampered by previous relationships. Cook also reported that "there must be something seriously wrong because Steve Regan, Janine Salveson and myself could not make a sale within the first six months." He also expressed surprise that there was no 401K plan in place. (Ex. 17.)

43. Rob Cook resigned his position on June 15, 1999, more than six months after he began. Chip Cohan expressed displeasure with Cook's results to date but not necessarily with his performance. (Ex. 17, Ex. 23 at 167.)

44. Janine Salveson, another National Accounts Manager hired directly by Theme without any involvement on the part of O'Keefe & Associates, reported similar concerns to Cook and Regan and also resigned her position. (Ex. 20.)

45. Crystal Hudson began employment on January 18, 1999 with an initial compensation of $82,000. On July 18, 1999, based on Sjoberg's recommendation that she was doing a "great job", she received a $1,000 gift check for her positive performance. On January 18, 2000, at her annual review, her compensation was increased by 10% to $90,200. At her second annual review on January 18, 2001, her

salary was increased by almost 10% to $99,000.  Hudson's performance evaluations at TCP indicate positive performance.  (Ex. 14.)

46.     Crystal Hudson was laid off as a result of company wide cut backs, which included non-O'Keefe personnel, on or about April 30, 2001.  (Ex. 14, Ex. 24.)

47.     Chuck Sjoberg indicated to John O'Keefe at the F&I Conference in May of 2001 that he was terribly unhappy that he had to let Crystal Hudson go because of business reasons.  Crystal Hudson, herself, indicated to O'Keefe that she was blindsided by her termination as she was led to believe that she was doing very well and felt overall that she got a "raw deal".  (Ex. 22 at 142.)

48.     Gersovitz testified that Crystal Hudson was laid off on April 30, 2001 as part of a company wide reduction in force.  This reduction in force affected employees not hired through O'Keefe.  Other employees who maintained their employment with Theme or at a certain salary level were asked to accept a 15% cut in compensation.  (Ex. 24 at 111, 112.)

49.     Rick Banez began employment on May 24, 1999 as Field Communications Manager at a starting annual salary of $89,000.  He received an increase to $93,400 on November 24, 1999.  On May 26, 2000, he received an increase to $99,000.  (Ex. 13.)

50.     On January 29, 2001, Banez was promoted to Director of Field Communications and received an increase to $115,000 per year.  Gersovitz concedes that he was a "good performer".  (Ex. 13, Ex. 24 at 129, 130).  Rick Banez resigned in

December of 2002 or January 2003 in order to take advantage of a "good opportunity at another company." (Ex. 24 at 49.)

51. Rick Banez was hired for Chuck Sjoberg's Field Communications group. "Chuck (Sjoberg) was looking for only all-stars so he saw quite a few candidates but he was holding out for the best." (Ex. 23 at 222.) Gersovitz testified at his deposition that Rick Banez was a good employee for Theme and was promoted to Director of Field Communications on or about January 29, 2001. Theme is not aware of any reason that O'Keefe would not be entitled to its full fee with regard to the hiring of Rick Banez. (Ex. 24 at 40, 129-130.)

52. Todd Nonken began employment on July 30, 1999 as Director of Marketing and Proposal Development at an initial compensation level of $175,000. (Ex. 19.)

53. Nonken reported directly to Gerry Gersovitz who couldn't recall any immediate plans to terminate Nonken. (Ex. 24 at 166.)

54. Nonken reported to O'Keefe that he was not happy right from the start with Theme's management style, lack of support and also thought that he had been misled as to the duties and responsibilities of the position and felt that given the level of autonomy that had been represented. Nonken also asked O'Keefe not to reveal this to Theme as he felt he would be terminated if he complained. (Ex. 22 at 147.)

55. Lori Rice began employment on August 2, 1999 as Field Communications Manager in the mid-West. Gersovitz conceded that she was a "very good performer".

(Ex. 24 at 129.) Gersovitz also concedes that Lori Rice has "done well" for Theme. (Ex. 24 at 67.) Gersovitz testified that Lori Rice has done well in her position with Theme and she is a very good performer. (Ex. 24 at 68, 129.)

56.   Carey Rogers was hired on August 30, 1999 as a National Account Director in the mid-West. On May 1, 2001, he was promoted to Group Vice President of Sales. His starting salary of $100,000 was increased to $150,000 on January 1, 2001 and $175,000 on May 1, 2001. Carey Rogers' performance evaluation for Theme indicated that he was a "great addition". Rogers ultimately resigned in 2002. (Ex. 11, Ex. 24 at 120-122.)

57.   The resume received from Carey Rogers by O'Keefe was forwarded by Theme to another recruiter, Johnson & Co., in the Summer of 1999 as an example of an ideal candidate for the position. On June 25, 1999, Walter "Chip" Cohan of Theme faxed a copy of Carey Rogers' resume to Stanley Johnson, senior partner at Johnson & Co. with a handwritten note stating "I will be interviewing this person in Chicago next week. Good profile example." (Ex. 21.)

58.   Theme assured Johnson & Co. that they had severed all ties and relationships with any other executive search firms. Theme's representations to Johnson & Co. were not true as it continued to maintain a relationship with O'Keefe & Associates. (Ex. 21.)

59.   Siena Long was hired on January 24, 2000 as Director of Business Development at a starting salary of $250,000. On February 14, 2000, her

responsibilities were increased to Director of Business Development and Marketing. On April 19, 2000, she was promoted to Vice President, Business Development and Marketing and received a $5,000 bonus. On December 4, 2000, she received an increase to $255,000 along with a $10,000 year-end bonus. (Ex. 15.)

60. On April 25, 2001, at the same time that other employees were being laid off or being asked to accept reductions in compensation due to Theme's business difficulties, Siena Long resigned her position. (Ex. 15, Ex. 24.)

61. Kevin Mulrain was presented by O'Keefe to Theme as a candidate for a National Account Director position in the East in approximately August of 1998. Mulrain ultimately determined that he was not interested in the position at that time. Mulrain thereafter began employment with Theme on January 3, 2000 as a Director of National Accounts in the East. (Ex. 16, 22-24.)

62. Although Gersovitz testified that Mulrain was a "not very good performer", his record would indicate otherwise. (Ex. 16, Ex. 24 at 150.) At his one-year anniversary, Mulrain's compensation was increased by 36% to $150,000. He also received positive performance reviews while employed by Theme. (Ex. 16.)

63. Mulrain was also terminated as a result of the reduction in force on April 30, 2001. (Ex. 16, Ex. 24.)

THE PLAINTIFF

BY_____
       Francis D. Burke
       MANGINES & BURKE, LLC
       1115 Main Street, Suite 708
       Bridgeport, CT  06604
       (203) 336-0887
       Fed. Bar No. ct18688

## **CERTIFICATION**

    This is to certify that a copy of the foregoing has been sent, via U.S. Mail, postage prepaid, this _____ day of November 2004, to:

David A. Ball, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT  06604

_____
Francis D. Burke