UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| O'KEEFE & ASSOCIATES, INC. | : | |
|     Plaintiff | : | |
| VS. | : | CIVIL ACTION NO. 3:00CV00678 (SRU) |
| THEME CO-OP PROMOTIONS, INC. | : | |
|     Defendant | : | DECEMBER  13, 2004 |

**MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff, O'Keefe & Associates, Inc. ("O'Keefe"), respectfully submits this Memorandum of Law in Opposition to Defendant's Motion to Dismiss dated September 27, 2004.  As set forth more fully below, Plaintiff has alleged sufficient facts in its Second Amended Complaint ("Complaint") filed on April 30, 2004 to support its claims for breach of the implied covenant of good faith and fair dealing (Count Three), fraudulent misrepresentation (Count Seven), and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count Eight).  As a result, Plaintiff's prayer for relief seeking attorneys' fees and punitive damages is also legally sufficient.

1. **Plaintiff Has Sufficiently Pled a Cause of Action for Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Three).**

Plaintiff has pled sufficient facts to support a cause of action sounding in breach of the implied covenant of good faith and fair dealing.  Defendant does not dispute that such an implied covenant, which is a part of every contract as a matter of law, existed in

this case. Instead, Defendant argues that Plaintiff has failed to allege that "the defendant engaged in conduct designed to mislead or deceive." (Def. Memo at p. 4.) In fact, the allegations contained in Count Three of Plaintiff's Second Amended Complaint are more than sufficient to establish a breach of the implied covenant of good faith and fair dealing. Paragraphs 37 and 38 of the Complaint allege that TCP knowingly refused to pay fees due O'Keefe, and knowingly asserted false claims and defenses, allegations which are supported by the record. (Ex. 6-8.)[1] The Complaint also alleges that Defendant has "a practice of seeking to avoid meeting its obligations to other recruiters and contractors" and "knowingly asserted false and unsupported objections and excuses in order to avoid paying O'Keefe what was rightfully due under the parties' agreements." (Complaint, ¶38, 43). For example, Defendant falsely asserted that one candidate, Lorri Rice, was never interviewed or otherwise evaluated by O'Keefe, and refused to reconsider or even discuss this allegation even after being presented with documentary evidence to the contrary. (Ex. 7, Ex. 8.)

Contrary to Defendant's assertions:

- the candidates presented to TCP were, in fact, qualified (Complaint¶39, Ex. 6-20);

- Lorri Rice was interviewed by Paul Sampson, tested and went through O'Keefe's whole process (Complaint ¶40, Ex. 8);

---

[1] Plaintiff's Exhibit references are to its Exhibits submitted in support of Plaintiff's Motion for Summary Judgment dated November 29, 2004, which are hereby incorporated by reference.

- there was no agreement that TCP would be do back any monies in the event that Siena Long Rice was not employed by TCP for a year or more (Complaint ¶41, Ex. 7, Ex. 8, Ex. 24 at 51-59);[2]

- there was no basis for TCP's assertion that it was due back fees with regard to the placement of Rob Cooke and Steve Regan, both of whom were admittedly employed by TCP in excess of six months (Complaint ¶42, Ex. 7, Ex. 8, Ex. 24 at 61).

O'Keefe & Associates fulfilled its contractual obligations to Defendant and presented ten qualified candidates, all of whom were interviewed, reviewed, accepted and hired by Defendant. At no time during this performance did TCP voice any dissatisfaction with O'Keefe's performance. Indeed, when John O'Keefe attempted to contact TCP's President and CEO, Gerry Gersovitz, Mr. Gersovitz failed to return his calls (Ex. 22 at 127-128). O'Keefe, therefore, sent TCP an Invoice Reconciliation memorandum dated November 24, 1999 (Ex. 6). Thereafter, TCP responded with a letter to O'Keefe dated December 13, 1999 (Ex. 7). In this correspondence, Mr. Gersovitz made many statements which were factually untrue and/or directly contradicted the express written terms of the Agreements between the parties (Ex. 1-5, Ex. 7). In a continuing effort to address these issues in good faith, O'Keefe responded by sending very detailed correspondence addressing these issues **the very next day** (Ex. 8). TCP refused to even respond to this letter, let alone address the issues in good faith.

In its December 14, 1999 correspondence to TCP, O'Keefe pointed out, among other things, that:

---

[2] In any event, Siena Long was admittedly employed by TCP in excess of one year.

3

- Contrary to TCP's assertion that there was a full year guarantee with regard to Siena Long's position, the contract expressly states that any responsibility to re-do the search, let alone repay any monies owed or received, ended once she had been employed by TCP for six months;

- Rob Cooke and Steve Regan were also employed by TCP for over six months and, therefore, under the express terms of the parties' contracts, no refund was due to TCP. Moreover, Paul Sampson's discussion with Chip Cohan left no doubt that "The issue was **not** the quality of the candidates, but the nature of the commission structure relative to TCP's business development on the East Coast."

- Chuck Sjoberg had indicated to Paul Sampson that he was "always on the look out" for outstanding talent and Paul should identify any such talent that he may come across. Lorri Rice was subsequently referred to O'Keefe by another of its candidates hired by TCP, Crystal Hudson. Contrary to Gersovitz's assertions in his December 13, 1999 correspondence, "Lorri participated in the entire O'Keefe & Associates process." O'Keefe even attached copies of Paul Sampson's interview notes and the personality profile completed by Ms. Rice.

(Ex. 8). Discovery in this case has established all of the above facts asserted by O'Keeke in its December 14, 1999 correspondence to be undeniably true.

Defendant's lack of good faith is evidenced by its complete lack of response to O'Keefe's good faith efforts to address these issues after December 13, 1999. Not only did TCP not respond to O'Keefe's December 14, 1999 correspondence, or otherwise attempt to resolve the issues in good faith, but Gersovitz testified that he never even discussed these issues with Chip Cohan or Chuck Sjoberg to ascertain the truth of the matter. (Ex. 24 at 98-102). Moreover, Defendant has completely abandoned its position as set forth in December 13, 1999 correspondence, in favor of new and equally dubious claims and defenses based on documents it received from O'Keefe in response to its discovery requests more than three years after the fact. Amazingly, the one

4

portion of its position that it seeks to maintain is its incredible assertion that, despite the express language of the written contract regarding Siena Long, "monies would be due back to Theme Co-Op if Siena did not stay in our employ for one year." (Ex. 7.) Of course, Gersovitz is unable to say when this alleged oral agreement was entered into, with whom, or the amount of "monies" due back to TCP. (Ex. 24 at 50-58) Under all of the circumstances, a juror could reasonably conclude that no such oral modification ever took place, and TCP's reliance on this phantom agreement was not made in good faith. TCP's similar claim that it is due back "monies" as a result of Rob Cooke or Steve Regan's leaving TCP after more than six months of employment is similarly meritless and has apparently been abandoned.

    Prior to November 29, 1999, when O'Keefe sent the Invoice Reconciliation memo to TCP, TCP had not expressed any concerns about O'Keefe's performance or its entitlement to fees (Ex. 22 at 128). The fact that TCP had such concerns came as a complete surprise to O'Keefe (Ex. 23 at 267). Crystal Hudson reported that her termination came out of nowhere – that she was led to believe she was doing a good job. Chuck Sjoberg also admitted that Ms. Hudson was doing a good job and that he was terribly unhappy he had to let her go (Ex. 22 at 144). Other TCP employees not hired through O'Keefe were leaving TCP's employ at the same time and for the same reasons. All of these facts undermine Defendant's stated reasons for withholding payments to O'Keefe.

There is also evidence to support Plaintiff's allegations that TCP's refusal to pay O'Keefe the fees it was owed was not made in good faith. Siena Long, who was second in command at TCP, told O'Keefe that she was not surprised that they had issues with TCP, that Gerry Gersovitz "keeps a staff of legal experts busy at all times", and that O'Keefe had probably been "squeezed" by TCP (Ex. 22 at 156-158). In addition, discovery in this case has revealed that TCP engaged in similar bad faith practices with regard to other recruiters and contractors, including Johnson & Company. Indeed, while TCP now claims that the candidates presented by O'Keefe were not qualified, Defendant actually faxed a copy of O'Keefe's confidential work product regarding Carey Rogers to Stanley Johnson at Johnson & Company, a direct competitor of O'Keefe's (Ex. 21). TCP sent Johnson & Company a copy of Carey Roger's resume as an example of an "ideal candidate" while O'Keefe was still engaged in job search efforts for Defendant. At the same time, Defendant falsely assured Mr. Johnson that it was not currently engaged with any other recruiters.

The above facts support Plaintiff's allegations that Defendant's actions were not prompted by an "honest mistake as to [its] rights or duties" but were motivated by "furtive design or ill will". (See, Def. Memo at p. 4.) Plaintiff has alleged, and will prove at trial, that Defendant refused to pay Plaintiff for its services not out of any genuine belief that these monies were not owed, but simply because it wished to avoid paying Plaintiff for services rendered. Indeed, Gersovitz himself could not come up with any explanation as to why O'Keefe was not paid for the services it rendered at the time it

was invoiced. (Ex. 24 at 81). Defendant's excuses, objections and justifications were not presented in good faith, and Defendant had no particular interest in their validity. Even after Defendant was provided with documentary evidence that its assertions were incorrect, Defendant failed to reconsider or even discuss its position. Defendant failed to mention any concerns it allegedly had about Plaintiff's performance until **after** O'Keefe had fully performed. When O'Keefe sought payment for the performance of its services, Defendant responded by asserting false and unsupported justifications as to why Plaintiff should not be paid. When Plaintiff responded by presenting documentary evidence as to why Defendant's asserted position was factually erroneous, Defendant refused to reconsider its position or even discuss the issues in dispute. Clearly, Defendant had no interest in engaging in a good faith attempt to address its alleged grievances.

Defendant acknowledges that "the law of Connecticut – the forum state – defines the elements of the state causes of action while federal law governs the procedure pleading requirements (Def. Memo at 3). Nonetheless, Defendant seeks to rely on case law and arguments based on the more stringent fact pleading requirements of the forum state. The notice pleading requirement under the federal rules requires only that claims be pleaded with sufficient specificity to put the opposing party on notice. See, e.g. Bruce v. Home Depot, USA, Inc., 2004 WL 513730 (D. Conn. 2004) (Attached as Defendant's Exhibit A). Plaintiff has more than met its notice pleading requirements

under the Federal Rules. As such, Defendant's Motion to Dismiss Count Four should be denied.

### 2. Plaintiff Has Sufficiently Pled a Cause of Action for Fraudulent Misrepresentation (Count Seven).

Plaintiff has alleged, and will prove at trial, that Defendant deliberately entered into agreements and contracts expressly stating that O'Keefe would be provided compensation in accordance with those contracts and agreements, all the while knowing that it would make only those payments necessary to obtain O'Keefe's continued performance. In fact, Defendant had a pattern and practice of engaging in such fraudulent conduct with other recruiters and contractors, including Johnson & Company. (Ex. 21). Defendant's fraudulent conduct and pattern and practice of "squeezing" its business partners necessitated that it keep "a team of legal experts busy at all times." (Ex. 22 at 156-158) Contrary to Defendant's argument that Plaintiff "does not allege what representations were made, by whom and to whom the alleged false statements were made, when the statements were allegedly made and where the statements were allegedly made" (Def. Memo at p. 9), Plaintiff's complaint spells out the date each contract was entered into, when, and by whom. (EX. 1-5). Plaintiff has further alleged that Defendant knew at the time it entered into these agreements that its representations were false and that it would follow its normal pattern and practice of making only those payments necessary to obtain O'Keefe's continued performance.

Similarly, Defendant's argument that Count Seven merely alleges a "garden variety breach of contract claim" (Def. Memo at p. 9) is unavailing. Plaintiff is not alleging that Defendant entered into contracts with Plaintiff in good faith and later, as a result of circumstance, breached those contracts. Rather, Plaintiff has alleged, and will prove at trial, that Defendant fraudulently entered into contracts with Defendant, all the while knowing that it would not honor its contractual commitments in good faith, but would follow its normal pattern and practice of evading its contractual responsibilities. As such, the allegations contained in Count Seven of Plaintiff's Second Amended Complaint are more than sufficient and Defendant's Motion to Dismiss should be denied.

3. **Plaintiff Has Alleged Sufficient Facts to Support a Claim for Violation of the Connecticut Unfair Trade Practices Act (CUTPA)**

Plaintiff has pleaded sufficient facts in Count Eight of its complaint to support its claimed violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). "Since fraud is not a necessary element of a state CUTPA claim, a plaintiff does not need to meet the heightened pleading requirements of Rule 9(b), Fed.R.Civ.P., when asserting a state CUTPA claim in federal court." Bruce v. Home Depot, USA, Inc., 2004 WL 513730 (D.Conn. 2004) (citations omitted) (Attached as Defendant's Exhibit A). Not only has Plaintiff pleaded sufficient facts to support a CUTPA claim, but the factual record overwhelmingly supports such a claim. As set forth in Section One above, there is more than sufficient evidence of Defendant's bad faith to constitute an unfair trade

practice under the "cigarette rule" adopted by the Connecticut courts. A practice may constitute an unfair trade practice under the "cigarette rule… because of the degree to which it meets one of the criteria or because, to a lesser extent, it meets all three." <u>Id.</u> In <u>Bruce</u>, Judge Goettel found that plaintiff had pleaded sufficient facts to support a CUTPA claim, citing favorably to a decision of the Connecticut Appellate Court:

> In *Lorobina v. Home Depot, USA, Inc.*, 76 Conn.App. 586, 821 A.2d 283 (2003), the plaintiff alleged breach of contract claims and a violation of CUTPA by Home Depot, when it attempted to exact a higher price for the sale and installation of carpet than what was stated on its standardized form documents. As a result, the plaintiff lost his bargain to have the carpet installed for the lower price. The Connecticut Court of Appeals held that this conduct constituted both a breach of contract and a violation of CUTPA.

<u>Id.</u> Here, Defendant has attempted to obtain O'Keefe's services at a **lower** price than the parties expressly agreed to and O'Keefe has lost his bargain as a result. The fact that TCP asserted false and unsubstantiated claims to support its refusal to meet its bargain (Ex. 7), combined with its history of squeezing other recruiters (Ex. 21) and other contractors (Ex. 22 at 156-158) brings this conduct squarely within the confines of the CUTPA statute.

In this case, Plaintiff acted in good faith not only to perform its end of the bargain but to address Defendant's stated concerns. Plaintiff provided a detailed response to the concerns stated by TCP in its December 13, 2004 correspondence. Defendant, in turn, refused to respond in kind, and has subsequently abandoned those claims which were completely lacking in merit. Defendant has clearly not acted in good faith, to

Plaintiff's detriment.  Moreover, there is evidence that Defendant's unfair practices in dealing with O'Keefe is not an isolated incident, but part of a pattern of unfair trade practices occurring as part of Defendant's normal course of business.  As such, the allegations contained in Count Eight of Plaintiff's Second Amended Complaint are more than sufficient and Defendant's Motion to Dismiss should be denied.

        THE PLAINTIFF


BY_____
        Francis D. Burke
        MANGINES & BURKE, LLC
        1115 Main Street, Suite 708
        Bridgeport, CT  06604
        (203) 336-0887
        Fed. Bar No. ct18688

## CERTIFICATION

This is to certify that a copy of the foregoing has been sent, via U.S. Mail, postage prepaid, this 13th day of December 2004, to:

David A. Ball, Esq.
Cohen and Wolf, PC
1115 Broad Street
Bridgeport, CT  06604


_____
Francis D. Burke